IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:23-mj-91 |
| MOHAMMED AZHARUDDIN CHHIPA, | |
| Defendant. | |

## <u>GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION</u>

The United States respectfully moves to detain the defendant, Mohammed Azharuddin Chhipa, pending trial, pursuant to 18 U.S.C. § 3142(e)(1). The defendant is alleged to have provided material support to the foreign terrorist organization ("FTO") ISIS by transferring money to a Syria-based ISIS member, who used it to break female ISIS members out of prison camps and to support ISIS fighters. As discussed below, the defendant is charged with a "Federal crime of terrorism" that carries a presumption that no condition or combination of conditions will sufficiently guarantee the defendant's presence in court and protect the safety of the community. Furthermore, the defendant has previously fled the United States when he believed an arrest was imminent. In addition, he subscribes to a violent ideology, has expressed interest in martyrdom, and is highly technically savvy and evasive. Accordingly, the defendant presents a serious risk of flight and danger to the community that cannot be mitigated by any condition or combination of conditions and should be detained pending trial.

## BACKGROUND

On May 4, 2023, the Honorable Lindsey R. Vaala, United States Magistrate Judge for the Eastern District of Virginia, authorized a complaint and arrest warrant for the defendant, charging him with one count of providing and attempting to provide material support to a designated terrorist organization, to wit, ISIS, knowing that the organization is a designated FTO, that the organization has engaged or engages in terrorist activity, or that the organization has engaged or engages in terrorism in violation of Title 18, United States Code, Section 2339B. Dkt. Nos. 3, 7. The charge is punishable by up to twenty years in prison and a lifetime of supervised release. The criminal complaint details that the defendant has transferred a vast sum of money—in excess of $188,000—under similar circumstances to the conduct directly charged in the complaint. Affidavit in Support of Complaint, ¶ 36 (Dkt. No. 4).

The charges against the defendant are the product of an extensive, long-term investigation conducted by the Federal Bureau of Investigation ("FBI"). As part of that investigation, FBI agents obtained and executed a search warrant on the defendant's residence on August 2, 2019. That night, while the search was still ongoing, the defendant left his home and drove his vehicle to the Apple Federal Credit Union, where he withdrew $1800 in cash from the ATM. The defendant then drove to a Taco Bell located in Burke, Virginia, where he requested a ride from a stranger and paid this individual to take him to the vicinity of a relative's house located in Springfield, Virginia. At some point thereafter, the defendant asked his relative for a ride to the Giant grocery store located in Springfield, Virginia. The defendant then provided the relative the keys to the defendant's vehicle and told the relative the vehicle's location in Burke, Virginia. When the relative asked the defendant what was happening, the defendant stated: "It's better you do not know what's going on."

On August 4, 2019, the defendant reported to work but did not personally clock in or out. He drove to work using his family's vehicle, but left work in an associate's vehicle. Later that evening, the defendant's family members retrieved the family vehicle driven by the defendant to his workplace. Beginning on August 5, 2019, the defendant purchased a series of bus tickets using variations and/or misspellings of his name and recently created email accounts. The defendant then travelled from Virginia to Mexico and then to Guatemala. On or about August 11, 2019, the defendant purchased tickets to fly from Guatemala to Panama, from Panama to Germany, and from Germany to Egypt. The U.S. government requested an Interpol Blue Notice[1] for the defendant, and he was returned to the United States.

Since then, the FBI has obtained numerous search warrants on social media accounts used by the defendant and his associates, and has also utilized undercover agents and/or confidential human sources in furtherance of the investigation. During the investigation, the defendant discussed the search warrant executed on his home and subsequent efforts to flee the United States. The defendant stated that he fled the country because he assumed he would be arrested after the search warrant.

On May 4, 2023, agents of the FBI arrested the defendant, and he made his initial appearance on May 5, 2023. Dkt. No. 10. The defendant has his preliminary hearing and detention hearing on May 10, 2023.

## THE BAIL REFORM ACT

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts must order a defendant's pre-trial detention upon determining that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person

---

[1] An Interpol Blue Notice is a request to locate, identify or obtain information on a person of interest in a criminal investigation.

and the community." 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *see United States v. Salerno*, 481 U.S. 739, 750 (1987). A finding of risk of flight must be supported by a preponderance of the evidence. *See United States v. Stewart*, 2001 WL 1020779, at \*2 (4th Cir. 2001). If the Court finds that no conditions will reasonably assure both the appearance of the defendant and the safety of any other person and the community, the Court shall order the defendant detained. 18 U.S.C. § 3142(e)(1). Thus, detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. 18 U.S.C. § 3142(e)(1), (f)(2).

The Bail Reform Act lists the following factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant, including family ties, financial resources, length of residence in the community, community ties, and past conduct; and (4) the seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Under governing case law, the government may proceed by factual proffer in lieu of presenting live witnesses at a detention hearing pursuant to the Bail Reform Act. *See United States v. Williams*, 753 F.2d 329, 331 n.7 (4th Cir. 1985) ("Evidentiary proffers are approved by 18 U.S.C. § 3142(f)."); *United States v. Chappelle*, 51 F. Supp. 2d 703, 706 (E.D. Va. 1999); *see also Gerstein v. Pugh*, 420 U.S. 103, 120 (1975) (approving of a judge issuing a detention order based on "informal modes of proof" such as hearsay and written testimony").

Under 18 U.S.C. § 3142(e)(3)(C), there is a rebuttable presumption that no conditions will assure a defendant's presence as to both flight risk and danger if, as in this case, the defendant is charged with an offense listed in 18 U.S.C. § 2332b(g)(5)(B) (a "Federal crime of terrorism"), for

which a maximum term of imprisonment of 10 years or more is prescribed.

When the presumption applies, it operates "at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).  However, the presumption is not "a bursting bubble" that disappears when any evidence is presented by the defense; rather, to rebut the presumption, "the defendant must produce some evidence while the judge remembers the fact that Congress found certain offenders to pose special risks of flight."  *United States v. Sheikh*, 994 F.Supp.2d 736, 739 (E.D.N.C. Jan. 10, 2014).  Put another way, the presumption remains as an evidentiary finding militating against release and to be weighed along with all the evidence relating to the factors listed in 18 U.S.C. § 3142(g).  *See United States v. Cherry*, 221 F. Supp. 3d 26, 32 (D.D.C. 2016) (citing *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011), and *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)).

## ARGUMENT

The defendant poses a significant danger to the community and risk of flight due to his association with a violent and dangerous FTO, his technical savvy in providing material support to them, the weight of the evidence against him, and his history of fleeing the country to evade law enforcement.

### Nature and Circumstances of the Offenses Charged

The defendant is charged with surreptitiously transferring money to an ISIS member in Syria in order to benefit the FTO by funding fighters and freeing other ISIS members from prison camps.  ISIS is one of the most dangerous and violent terrorist groups operating anywhere in the world.  They gained international notoriety for a long list of atrocities, including: their videos of beheadings and other types of executions of both soldiers and civilians, their conquering of

territory and declaration of a caliphate governed by a severe interpretation of Sharia law, and their systematic persecution of Yazidis, Christians, and Shia Muslims. They have also inspired several attacks in Europe and the United States.

It is often said that money is the lifeblood of terrorist organizations. *See, e.g.*, *Terrorist Financing since 9/11: Hearing Before the H. Subcomm. on Counterterrorism and Intelligence*, 112 Cong. (2012). One source of funding that "[ISIS] relies on [is] grass-root funding sources," that it procures by "[using] social media platforms to secure individual-level acts of material support." Financial Action Task Force [FATF], *Financing of the Terrorist Organization ISIL*, at 36, https://www.fatf-gafi.org/en/publications/Methodsandtrends/Financing-of-terrorist-organisation-isil.html. According to the 2022 Department of Treasury National Terrorist Financing Risk Assessment, ISIS's largest expenditures are the salaries it pays fighters and payments to families of imprisoned or deceased fighters. In Syria and Iraq in particular, ISIS primarily spends its funds on salaries and stipends for its members (including families of deceased fighters) and on supporting operational activities (e.g., food, clothing, arms, training, and propaganda).

As detailed in the complaint, the defendant raised and sent funds that helped alleviate those primary expenditures of the FTO. Evidence gathered during the course of the investigation indicates the defendant was successful in funding the escape of numerous individuals, including the family members of fighters. *See* Affidavit in Support of Complaint, ¶ 32. In addition, although only a small portion of the total amount of money transferred by the defendant was specifically labeled for fighters, even a few hundred dollars can be sufficient to finance an attack. *See, e.g.*, Scott Neuman, *Why Use A Pressure Cooker To Build A Bomb,* NPR (Apr. 17, 2015), https://www.npr.org/sections/thetwoway/2013/04/17/177605063 /why-use-a-pressure-cooker-to-build-a-bomb (bomb used in Boston Marathon bombings "cost around $100 to construct"); Dina

6

Temple-Raston, *How Much Does a Terrorist Attack Cost? A Lot Less Than You'd Think*, NPR (June 25, 2014), https://www.npr.org/sections/parallels/2014/06/25/ 325240653/how-much-does-a-terrorist-attack-cost-a-lot-less-than-you-think.

Congress recognized the serious nature of terrorism by specifically compelling courts to consider whether the alleged crime is a "Federal crime of terrorism."  18 U.S.C. § 3142(g)(1).  The government considers this a highly serious terrorism offense meriting a considerable period of incarceration.  *See, e.g., United States v. Anderson*, 384 F. Supp. 2d 32, 36 (D.D.C. 2005) (holding the gravity of the offenses and the potential prison term create a considerable incentive for the defendant to avoid prosecution and the likelihood of imprisonment in the event of a conviction).

## History and Characteristics of the Defendant

The defendant's past conduct strongly militates in favor of detention.  As previously detailed, the defendant fled the country when he thought he faced prosecution.  He did so in a particularly deceptive way, using a variety of tactics to obscure his actions, including abandoning his vehicle and using vehicles belonging to others, paying a stranger to drive him to a relative's house, booking bus tickets in misspelled versions of his name, and attempting to fly to Egypt using multiple flights once outside of the United States.  His actions necessitated international cooperation to return him to the United States.  The defendant explicitly stated that he fled because he believed an arrest was imminent.

Because the defendant actually fled when he expected to face similar charges to the one in the criminal complaint, the government submits he is very likely to do so again.  In fact, now that he has actually been charged, he is in a worse situation than he was in 2019, with even greater incentive to flee.

## Safety of the Community

The defendant's prior statements indicate that he is comfortable with extreme violence.  As detailed in the complaint, an FBI review of the defendant's seized devices from an August 2019 search warrant found "thousands of videos, pictures, essays, books, notes, and search histories about extremist ideology, jihad, ISIS, and violent propaganda."  Affidavit in Support of Complaint, ¶ 23.  The defendant has defended cruel acts of the FTO, including the burning alive of a Jordanian pilot inside of a cage, and possessed images of what appeared to be the beheading of an ISIS prisoner.  Affidavit in Support of Complaint, ¶¶ 23, 24.  Furthermore, the defendant possessed bomb-making instructions and has expressed a desire to die a martyr.  Affidavit in Support of Complaint, ¶¶ 20, 23.  All of these things indicate that the defendant is a danger to the community.

In addition, the defendant's technical savvy and evasiveness with law enforcement underscore the impossibility of finding any condition or combination of conditions that could reasonably assure the safety of the community.  The defendant has gone to great lengths to obfuscate his conduct, creating numerous social media accounts in fake names, using virtual private networks at times to disguise his IP address, using disappearing chats on encrypted messaging platforms, using multiple phones, and generating fake numbers through online applications.  Meanwhile, ISIS MEMBER 1 is still at large in Syria.  If the defendant were released, it would be virtually impossible to ensure that he did not continue the conduct alleged in the complaint, i.e., secretly sending funds "with no tracks" to ISIS MEMBER 1 or others in Syria.  Affidavit in Support of Complaint, ¶ 30.  As a result, no condition or combination of conditions will reasonably assure the safety of the community.

## Weight of the Evidence

Where the evidence of guilt is strong, it provides a considerable additional incentive to

flee.  *See United States v. Sheikh*, 994 F.Supp.2d 736, 742 (E.D. N.C. Jan. 10, 2014) (finding defendant had strong incentive to not appear in part because the evidence is strong).  This case relies heavily on communications with FBI undercover agents and/or confidential human sources that are recorded or otherwise preserved.  Affidavit in Support of Complaint, ¶ 17 n. 1.  The government also intends to introduce financial records, statements obtained from social media companies, and other electronic evidence against the defendant.  Given the strength of the evidence against him, there is no condition or combination of conditions that would assure the defendant's appearance in court or the safety of the community.

## Conclusion

For the foregoing reasons, there is "no condition or combination of conditions will reasonably assure the appearance of the [Defendant] as required and the safety of the community." 18 U.S.C. § 3142(e)(1).  Accordingly, he should be detained pending trial.


Respectfully submitted this 9th day of May, 2023.


Respectfully submitted,

Jessica D. Aber
United States Attorney

By:    _____/s/_____

Anthony T. Aminoff
Amanda Lowe
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3790
Facsimile (703) 299-3980
Anthony.aminoff@usdoj.gov
Amanda.lowe@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on May 9, 2023, I filed electronically the foregoing with the Clerk of Court

using the CMF/ECF system, which will serve all counsel of record.


By:    _____/s/_____

Anthony T. Aminoff
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Office:   (703) 299-3700
Fax:      (703) 299-3980
Email:    anthony.aminoff@usdoj.gov