IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MOHAMMED AZHARUDDIN CHHIPA,<br><br>Defendant. | Case No. 1:23-CR-97<br><br>Hon. David J. Novak |

## MOTION *IN LIMINE* REGARDING INAPPLICABILITY
## OF ENTRAPMENT DEFENSE

The United States of America, through undersigned counsel, hereby respectfully submits this motion *in limine* regarding entrapment in response to the defendant's proposed jury instructions. The government seeks that the Court: (1) require the defendant to proffer a factual basis for an entrapment defense; (2) preclude the defendants from offering such a defense if they cannot proffer a sufficient factual basis; or (3) allow the parties to submit a curative instruction in the event that the Court allows the defendants to argue entrapment during the trial, but they fail to adduce sufficient evidence for the jury to be instructed on entrapment as a matter of law.

### Background

The defendant has a long history of making statements in support of terrorism and foreign terrorist organizations. In 2009, the defendant stated in an interview with law enforcement at the U.S.-Canadian border that he wanted to go to Iraq and kill Americans in support of his Muslim brothers. Also in 2009, the defendant applied to be a baggage handler at Dulles airport. At an interview for that position, he stated his admiration for the teaching of Anwar al-Awlaki and his desire to go to China and fight with Chinese Muslims there. Between 2008 and January 2015, the

1

defendant routinely posted content reflecting his support for Foreign Terrorist Organizations (FTOs), including Al-Qaeda. The defendant largely ceased posting propaganda from 2015 until 2019, when the defendant began posting highly radical ISIS propaganda and items in support of radical clerics, such as Anwar al-Awlaki. On or about March 15, 2019, the defendant became friends with a foreign confidential human source, T.M, a fact that the U.S. government was not immediately aware of. After an initial, non-substantive conversation with T.M., the defendant messaged her the next day, on March 16, 2019, and stated that he only saw three paths for himself in life, "prison," traveling overseas and fighting ("hijrah/jihad"), or martyrdom ("shahadah").

According to the defendant himself, he began sending money to the "sisters" in early 2019.[1] The government has records of transactions to two ISIS women in the Philippines beginning on April 7, 2019. The first member of U.S. law enforcement to contact the defendant in this time period was OCE-3, who first engaged in direct messages with the defendant on Facebook on March 25, 2019 to discuss a Facebook group that the defendant was active in called Contaminated Minds. They continued to discuss things like propaganda posted online until June 19, 2019, when the defendant posted a video of how to disable someone with a punch to the throat. OCE-3 asked the defendant if he was "planning for qital [killing]," to which the defendant responded "Na'am akhee in sha Allaah [yes my brother God willing]." When pressed against whom, the defendant responded, "Kuffar/murtadeen/munafiqeen/ etc… [non-believers, apostates, hypocrites, etc.]." OCE-3 asked if the defendant was going to do an "operation," to which the defendant responded, "Na'am [yes] we will see what happens in sha Allaah [God willing] in this next couple of months."

The defendant continued to send money to the Philippines, with the FBI ultimately executing a search warrant on the defendant's house on August 2, 2019. In approximately October

---

[1] The defendant told UCE-2 this in a recorded conversation.

of 2019, the defendant began repeatedly posting about sending money to ISIS women in Syrian prison camps. Beginning on approximately March 22, 2020, OCE-3, who knew the defendant was involved in sending money to Syrian prison camps, told the defendant that he also wanted to send money to a woman in the Syrian prison camps. OCE-3 then asked the defendant if he could confirm that the woman in question was really an ISIS member. OCE-3 never asked the defendant to send money on his behalf.

On approximately February 9, 2020, OCE-5 contacted the defendant on Telegram private message on the pretext that OCE-5 was a friend of Facebook user T.M. and to act as an interlocutor between the defendant and T.M. on the subject of the defendant's interest in marrying T.M. On or about May 28, 2020, OCE-5 asked the defendant, "she [T.M.] probably wants to know not only if you support Dawlah [ISIS] but like also if you going to do something the kaffirs [non-believers] consider illegal to support them." The defendant replied in relevant part, "As long as I have spare amount of money left and I can still help the brothers and their families then I will continue to support them for as long as I'm able." OCE-5 responded, "…that's also what I'm talking about. Is that something you think the kuffar [non-believers] will arrest you for. I mean if she's thinking she might be alone after a certain period of time that might be pretty unsettling you know." The defendant replied, "Well they haven't arrested me yet." OCE-5 continued to press the defendant for reassurance that he would not get himself arrested. OCE-5 said, "some would say you can serve Allah and his purpose without serving Dawlah [ISIS], right?" The defendant responded, "Yeah in that (sic) terms I cannot guarantee anything ukhti [my sister]. Well yes, but I'm aiming for the things no one is willing to do in our times right now." OCE-5 asked the defendant what he meant, and the defendant said that people were "scared and terrified" to help the sisters in the camps financially. He went on to say that while he would be eager to help any Muslim prisoners, because

they were "from the dawlah [ISIS] that makes me even more eager to give because I know the reward for it is much more and their husbands dies as shahadah [martyrs] … and some are still fighting. And we all know the one who supports the family of a mujaahid [fighter] it is like he has fought." OCE-5 never asked the defendant to send money, and, in fact, actively sought assurance from the defendant that he would not engage in illegal activity.

OCE-5 eventually introduced the defendant to UCE-2 to further vet the defendant for marriage with T.M. The defendant met with UCE-2 twice, with the first meeting occurring in July of 2020. The defendant discussed with UCE-2 how, since early 2019, he was sending "money to the sisters…I found out about the sisters in the camps, you know the Syrians, so I started sending them help." When asked if he was sure he was sending the money to "good people over there," the defendant replied that he was, because if these people were agents, then he would "be in prison." The defendant went on to state, "I don't care who it is, whether it's my parents, my wife, … anyone who is going to intervene and tell me to stop doing something for the sake of Allah, I'm not going to listen to them. I'm going to do what pleases Allah no matter what…We're not doing anything wrong…anything to do with, you know, the sisters or in Syria or in Turkey, or anything, people automatically say terrorist terrorist terrorist terrorist, but even if they are a terrorist, even if they're the worst person in the world, as long as they're a Muslim brother or sister…" before being interrupted by UCE-2. UCE-2 was generally supportive of the things the defendant told him, but at no point did UCE-2 ask the defendant to send money to ISIS for him.

The defendant met again with UCE-2 in approximately October of 2020, after he was no longer interested in marrying T.M. They predominantly discussed safety precautions online. The defendant discussed how the most secure means was Telegram's "secret chat." The defendant stated, "secret chat in Telegram is more encrypted and stuff. So meaning like if they really had

4

that I would be in prison right now. Lets put it that way. I mean I'm not doing anything wrong it's just like you know some conversations were that you know sensitive."

In March of 2021, the defendant's co-conspirator, UCC-1, an ISIS member who had already escaped from the Syrian prison camps and helped to distribute the money the defendant sent, contacted CHS-6. UCC-1 told CHS-6 that the defendant's PayPal (one of the primary means by which donors sent money to the defendant) had stopped working, and asked if she could receive money via PayPal, cash it out, and hand the money to the defendant for him to remit to her in cryptocurrency. CHS-6 declined, but UCE-3, assuming CHS-6's online persona, contacted UCC-1 in August of 2021 to say she wanted to send her money for ISIS fighters and women in the prison camps. UCC-1 gave UCE-3 the defendant's Telegram handle and told her to contact the defendant to facilitate the transfer. At UCC-1's direction, UCE-3 contacted the defendant, who stated it was important to meet to establish trust. The defendant went on to say, "if it's a sister in the camp, and she's telling me to do this, meaning Umm Dujana [alias for UCC-1] is the one who referred me to you, so it's on her, if you turn out to be like one of the 40 year old American FBI agents, fat American FBI agent, then it's on her…I'm not saying I'm scared or anything…even if you are, I don't care I'll go to prison." UCE-3 would meet up with the defendant four times to transfer money to him. Before the second transfer, UCC-1 put in the three-way chat that she would set aside the money for the "brs," with brothers being a known code-word for ISIS fighters. UCE-3 is the only government agent to have given the defendant money to send.

**Legal Argument**

**A. The defendant should be precluded from arguing entrapment at trial if they cannot proffer a sufficient factual basis for the defense.**

The defendant recently suggested by virtue of his jury instructions and motion for a deposition that he may pursue an entrapment defense. Without a factual basis from which to argue

5

entrapment, there is a very realistic concern that the defendant's attempt to assert this defense at trial (in the opening statement or on cross-examination, for example) may inflame, distract, and confuse the jury if no entrapment charge is ultimately given by the Court. Accordingly, the government requests that the Court preclude the entrapment defense, including any argument to the jury regarding entrapment, unless the defendant is first able to proffer a specific factual basis for asserting the defense at trial.

The entrapment defense involves two interrelated elements: (1) the government's inducement of criminal conduct, and (2) the absence of criminal predisposition to commit the offense. *Matthews v. United States*, 485 U.S. 58, 62-63 (1988). These elements are defined as follows:

> The first element, "inducement," requires more than mere solicitation by the government; "inducement" is a "term of art" necessitating "government overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." The second element, "predisposition," refers to "the defendant's state of mind before government agents make any suggestion that he shall commit a crime"; the government does not entrap a defendant, even if he does not specifically contemplate the criminal conduct prior to this "suggestion," if "his decision to commit the crime is the product of his own preference and not the product of government persuasion."

*United States v. Hsu*, 364 F.3d 192, 198 (4th Cir. 2004) (citations omitted).

Entrapment is an affirmative defense. *United States v. Sarihifard*, 155 F.3d 301, 308 (4th Cir. 1998) (citing *United States v. Blevins*, 960 F.2d 1252, 1257 (4th Cir. 1992)). The defendant bears the initial burden of presenting evidence that the government induced him to commit the offense. *United States v. Akinseye*, 802 F.2d 740, 743 (4th Cir. 1986) (citing *United States v. Perl,* 584 F.2d 1316, 1321 (4th Cir. 1978)). There is no defense of private entrapment; a defendant induced to commit a crime by a private party, not acting as a government agent, cannot advance a

defense of entrapment. *United States v. Squillacote*, 221 F.3d 542, 565 (4th Cir. 2000). Once the defendant presents evidence of inducement, the burden rests on the government to overcome an entrapment defense by proving the predisposition of the defendant. *Akinseye*, 802 F.2d at 743. "Inducement" requires government overreach "and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." *United States v. Hsu*, 364 F.3d 192, 198 (4th Cir. 2004) (quoting *United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993)). A government "sting," *i.e.*, providing an opportunity for the defendant to commit a crime, is perfectly proper. *Sherman v. United States*, 356 U.S. 369, 372 (1958).

It is well settled that "[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Matthews*, 485 U.S. at 63; *United States v. Dornhofer*, 859 F.2d 1195, 1199 (4th Cir. 1988) (as long as jury instructions have evidentiary foundation and are accurate statements of law, district court should include instructions regarding defendant's theory of defense). It is equally well-established, however, that a court may conduct a pre-trial evidentiary hearing "to determine whether a defense fails as a matter of law." *United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997); *United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990); *United States v. Santiago-Godinez*, 12 F.3d 722, 727 (7th Cir. 1993) ("where the evidence proffered in response to a motion *in limine* raised by the government is insufficient as a matter of law to support the affirmative defense, a pretrial ruling precluding the presentation of the defense at trial may be appropriate"); Fed. R. Cr. P. Rule 12(b)(1) (a party may raise by pretrial motion any defense that the court can determine without a trial on the merits).

In the case of entrapment, the question of "inducement" has been deemed more amenable to pretrial resolution, while predisposition is less susceptible to resolution as a matter of law that

7

can be decided pretrial. *United States v. Shade*, 2021 WL 4295155 (W.D. N.C. July 12, 2021), *citing United States v. Mayfield*, 771 F.3d 417, 442 (7th Cir. 2014). The Fourth Circuit has affirmed pre-trial findings that no entrapment existed as a matter of law when the defendant initiated criminal conduct on his own volition. *See United States v. Osborne*, 935 F.2d 32, 38 (4th Cir. 1991) (although it should be "rare case," district judge has the duty of determining whether the defendant has met this initial burden of establishing entrapment and can do so pre-trial). "If, after the hearing, the court finds that the defendant's evidence is insufficient as a matter of law to establish the defense, the court is under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury." *Paul*, 110 F.3d at 871.

Here, the defendant described to OCE-3, OCE-5, and UCE-2 crimes that he was already committing since early 2019. Neither OCE-3, OCE-5, nor UCE-2 asked the defendant to send money to ISIS, and there is no evidence at all that T.M. asked the defendant to send money to ISIS either. On the contrary, through OCE-5, it is clear that T.M. was concerned that the defendant would go to jail. However, each time OCE-5 raised this concern, the defendant reaffirmed his dedication to supporting ISIS over anything else. For counts two through five of the Superseding Indictment, the defendant's co-conspirator acknowledged an ongoing conspiracy with the defendant to the controlled persona "Kat" (CHS-6), and then referred "Kat" (UCE-3) to the defendant to transmit funds. The defendant acknowledged that he was meeting the undercover agent because "Umm Dujana" [UCC-1] asked him to do so. Furthermore, these transactions occurred nearly two years into the charged conspiracy.

> **B. If the Court declines to rule on entrapment now, the defendant should be barred from raising the entrapment defense in the presence of the jury until the Court finds sufficient evidence of entrapment has been adduced, or else the Court should give a curative instruction.**

If the Court denies the current motion precluding the defendant from arguing entrapment without a factual proffer, the government respectfully requests a ruling that the defense not explicitly argue entrapment to the jury unless and until the Court finds a sufficient legal basis for the defense. The government is concerned that if the defendant argues entrapment throughout the trial, yet fails to adduce facts entitling them to an entrapment jury instruction, the jury would be confused as to whether entrapment is a legally proper defense in this case. Without guidance from the Court, the jury will be unable to process these arguments properly, and could well believe, mistakenly, that entrapment is a valid basis to acquit the defendant. Indeed, legally unsupported entrapment arguments are essentially arguments for jury nullification, which courts have an obligation to prevent. *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) (a trial judge "may block defense attorneys' attempts to serenade the jury with a siren song of nullification").

Alternatively, if the defendant does explicitly argue entrapment to the jury without adducing sufficient evidence to warrant a jury instruction on the defense, the government would request a curative instruction to the jury that entrapment is not a valid defense in this case and should not be considered by the jury. *See, e.g.*, *United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996) (if defense counsel attempts to argue jury nullification, the trial court may make an appropriate corrective instruction).

**Conclusion**

Therefore, for the above-stated reasons, the United States asks the Court to preclude the defendant from raising an entrapment defense at trial unless and until they provide a factual proffer that provides a basis in law for this affirmative defense, or else allow the parties to submit a curative instruction in the event that the defense argues entrapment, but the entrapment instruction is determined to be not appropriate as a matter of law.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

_____/s/_____
Anthony T. Aminoff
Amanda St. Cyr
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone (703) 299-3790
Facsimile (703) 299-3980
Anthony.aminoff@usdoj.gov

Andrew J. Dixon
Andrea Broach
Trial Attorneys
Counterterrorism Section
National Security Division, Dept. of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of November, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

                                              /s/
                                      Anthony T. Aminoff
                                      Assistant United States Attorney
                                      United States Attorney's Office
                                      Eastern District of Virginia
                                      2100 Jamieson Avenue
                                      Alexandria, VA 22314
                                      Telephone (703) 299-3790
                                      Facsimile (703) 299-3980
                                      Anthony.aminoff@usdoj.gov