**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> MOHAMMED AZHARUDDIN CHHIPA, <br> *Defendant*. | Case No.: Case No.: 1:23-cr-97 (DJN) <br><br> Sentencing:  May 7, 2025 at 10:30 a.m. |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS
<u>POSITION WITH RESPECT TO SENTENCING</u>**

Mohammed Azharuddin Chhipa, by counsel, respectfully submits this Memorandum in

Support of his Position on Sentencing.  For the reasons stated herein, Mr. Chhipa requests that

this Honorable Court impose a sentence of *no greater than* 96 months imprisonment.  Such a

sentence is consistent with the requirements outlined in 18 U.S.C. § 3553(a), given the unique

facts of Mr. Chhipa's case.

## <u>ARGUMENT</u>

### I.     Objections to the Guidelines Calculation

Since *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has required

district courts to consider *both* the United States Sentencing Guideline ("U.S.S.G") range and the

sentencing factors set out in 18 U.S.C. § 3553(a) when determining a criminal defendant's

ultimate sentence.  As such, sentencing courts are instructed to first correctly calculate the

Guideline range for a given defendant, then consider the § 3553(a) factors to determine whether

a sentence within the Guideline range is appropriate or whether a departure or variance from the

Guidelines is warranted.  *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("[o]ur cases do not

allow a sentencing court to presume that a sentence within the applicable Guidelines range is

reasonable . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Moreover, before a sentencing Court can apply any given sentencing enhancement under the Guidelines, the Court must first find, under a preponderance standard, that evidence supports such an enhancement. *See United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009) ("[p]reponderance of the evidence is the appropriate standard of proof for sentencing purposes"); *United States v. Noe*, 191 Fed. Appx. 216 (4th Cir. 2006) (district court's use of preponderance of evidence standard in making factual findings supporting sentencing enhancements was constitutional). Additionally, in determining whether a given Guideline provision applies to a specific case, a sentencing court must first examine the guideline's plain text. *See United States v. Campbell*, 22 F.4th 438, 444 (4th Cir. 2022) ("[i]t is the guideline's text, of course, that takes precedence, and so that is where we begin. And in doing so, if possible, we will give a guideline's text 'its plain meaning' ") (internal citations omitted).

Here, Mr. Chhipa objects to the application of the terrorism enhancements at U.S.S.G. §3A1.4(a), which adds twelve levels to Count Group 1; and separately to §3A1.4(b), which artificially changes his criminal history classification from Category I to VI. *See* PSR, ¶¶65, 73, 83. Mr. Chhipa also objects to the two-level Specific Offense Characteristic enhancement at U.S.S.G. §2M5.3(b)(1)(E)—the provision of funds with the intent/knowledge that such funds were to be used to commit a violent act. *See* PSR, ¶72.

### a. *Terrorism enhancements—§3A1.4(a) and (b)*

Mr. Chhipa objects to the application of U.S.S.G. §3A1.4 (a) and (b) –i.e., the "terrorism enhancement"—as mere knowledge of a foreign terrorist organization's mission when providing material support is insufficient, without more, for its application. *See United States v. Chandia*,

675 F.3d 329, 334 (4th Cir. 2012).  The Guidelines, under §3A1.4, provide for a twelve-level

enhancement if the offense of conviction is a felony that involved (or was intended to promote) a

federal crime of terrorism.[1]  A "federal crime of terrorism" means an offense that  "[1] *is*

*calculated to influence* or affect the conduct of government by intimidation or coercion, or [2] to

retaliate against government conduct; and [3]" is one of the listed statutory offenses —for which

the criminal conduct charged here is.  *See* 18 U.S.C. §2332b(g)(5)(A) and (B) (emphasis added).

If the offense qualifies, a defendant's criminal history is also artificially increased to Category

VI, regardless of their actual criminal history.  *See* U.S.S.G. §3A1.4(b).

   In *Chandia*, the Fourth Circuit found that the District Court initially "applied the wrong

legal standard by equating intent with knowledge[,]" when it applied the terrorism enhancement

at sentencing.  *Id*. (citing *United States v. Chandia*, 395 F. App'x 53, 60 (4th Cir. 2010)

("*Chandia II*")).  The court explained that the "[defendant's] knowledge that [the Foreign

Terrorist Organization] had a terrorist purpose supported his material support *convictions* but

'that does not automatically yield an inference of the specific intent required for the terrorism

*enhancement* to apply.' " *Id*. (emphasis added).  The Fourth Circuit held that the District Court

must "explain how specific facts indicate that [the defendant's] motive in providing material

support constituted the requisite intent for the terrorism enhancement." *Id*. (internal quotations

omitted).  Specifically, the Fourth Circuit in *Chandia II* ruled that:

> In particular, the court did not make any factual findings regarding whether
> [defendant] committed the offense with intent to influence or affect the conduct of
> government by intimidation or coercion, or to retaliate against government
> conduct… Most importantly, we rejected the contention that the § 3A1.4(a)
> terrorism enhancement  automatically applies to a material support conviction.  We
> emphasized that unlike cases in which the underlying conviction involves violence,

---

[1] The commentary to §3A1.4, cmt. n.1. states that: "[f]or purposes of this guideline, "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5)."

the facts of [defendant]'s conviction [] did not alone give rise to an automatic inference of the required intent."

*United States v. Chandia*, 395 Fed. Appx. 53, 56 (4th Cir. 2010) (internal citations omitted).  *See also United States v. Ramirez*, 16 F.4th 844, 853 (U.S. 11th Cir. 2021) ("Other circuits have read the phrase 'calculated to' as creating something akin to, or closely resembling, 'a specific intent' requirement.") (citing *United States v. Alhaggagi*, 978 F.3d 693, 699-700 (9th Cir. 2020); *United States v. Ansberry*, 976 F.3d 1108, 1127-28 (10th Cir. 2020); *United States v. Mohamed*, 757 F.3d 757, 759-60 (8th Cir. 2014); *United States v. Wright*, 747 F.3d 399, 408-09 (6th Cir. 2014); *United States v. Hassan*, 742 F.3d 104, 148 (4th Cir. 2014); *United States v. Awan*, 607 F.3d 306, 313-14 (2d Cir. 2010)).

Indeed, the Fourth Circuit is hardly the only court to question the terrorism enhancement and how it is applied.  In *United States v. Jumaev*, the district court found, after a jury trial, that the terrorism enhancement did not apply, despite the defendant providing money to a foreign terrorist organization.  *See United States v. Jumaev*, 2018 WL 3490886 (D. Colo. July 18, 2018), *aff'd*, 20 F.4th 518 (10th Cir. 2021).  The court called the enhancement "draconian" and explained that the:

> [t]errorism [e]nhancement only applies if [the court] find[s] that [the defendant] had some intent that was not required for the jury to find him guilty.  [The court] struggle[s] to find that [the defendant] had either the specific intent to commit crimes that were calculated to influence, affect, or retaliate against a government or the intent to promote another's federal crime of terrorism when the jury's conviction of him could rest only on his knowledge. [The defendant] convincingly argues that he both could have intended to repay his debt … while knowing that the funds would go to support a foreign terrorist organization.

*Id*. at *7.[2]  Likewise, here, Mr. Chhipa can reasonably argue that he both could have intended to donate funds to assist a humanitarian crisis in assisting the women and children in the IDP camp—individuals that the government's own expert admits were starving and were without medical care—while also conceivably knowing that his donated funds would go through a foreign terrorist organization.[3]

In *United States v. Alhaggagi*, 978 F.3d 693, 695 (9th Cir. 2020), the defendant participated in chat rooms sympathetic to ISIS.  In one chat, the defendant was asked if he supported the Caliphate State, to which he responded "of course." *Id*., at 697.  In another chat with an undercover FBI agent, he claimed he could procure weapons and "made disturbing claims suggesting he had plans to carry out attacks against '10,000 ppl' [] by detonating bombs in gay nightclubs [], setting fire to residential areas [], and lacing cocaine with the poison strychnine and distributing it on Halloween." *Id.*, at 695.  The defendant opened social media accounts for proclaimed ISIS supporters, accessed a bomb-making manual, and posted "in chatrooms materials about jihadist courses, instructions to build a napalm bomb and chloroform, and links to a training video for ISIS supporters about how to assist in cyberattacks." *Id.* Nevertheless, the court held that the terrorism enhancement did not apply, stating:

> The enhancement, [] does not automatically apply to all material support offenses. Congress created this distinction in order to punish certain dangerous terrorists more severely than persons who committed non-violent crimes. Thus, to warrant a substantial increase in punishment pursuant to the terrorism enhancement, a defendant must have the requisite intent necessary to satisfy the definition of federal

---

[2] The district court also found that increasing the 51-year old's criminal history category from I to VI substantially over-represented the seriousness of his criminal history.  It therefore departed it back down to Category I under U.S.S.G. § 4A1.3(b)(1). *Jumaev*, 2018 WL 3490886, at *9

[3] Mr. Chhipa maintains his innocence as to the offense conduct, and the arguments advanced here are not admissions; they should be fairly characterized as possible interpretations of the government's evidence adduced at trial.

crime of terrorism, beyond the intent required to establish a violation of the material support statute.

*Id.* at 699.

In reversing the district court's finding that the terrorism enhancement applied, the Ninth Circuit held (and significantly relied on the Fourth Circuit's opinion in *United States v. Chandia* (*Chandia I*), 514 F.3d 365, 376 (4th Cir. 2008)) that:

> [t]he district court's 'cause and effect' reasoning is insufficient because the cause— opening social media accounts—and the effect—influencing government conduct by intimidation or coercion—are much too attenuated to warrant the automatic triggering of the enhancement. Instead, to properly apply the enhancement, the district court had to determine that [the defendant] knew the accounts were to be used to intimidate or coerce government conduct.

*Id.*, at 702.  Importantly, the Ninth Circuit specifically held that "[w]hile [the defendant] expressed his support for ISIS in conversations about creating the account, he did not indicate that he hoped or intended that those accounts would be used to spread any specific type of content." *Alhaggagi*, 978 F.3d at 703 (citing *Awan*, 607 F.3d at 317 ("[c]alculation is concerned with the object that the actor seeks to achieve through planning or contrivance.")).

The Ninth Circuit also found that the government could not satisfy the "retaliation prong" because "cases applying the retaliation prong rely on evidence that the defendant intended to respond to specific government action." *Alhaggagi*, 978 F.3d at 703.  The court explained:

> While providing support to terrorist groups inevitably strengthens their ability to retaliate against government conduct, it is not enough that such support will generally 'lead[] to' more acts of terrorism. That reasoning does not distinguish between conduct that satisfies the material support statute and the specific intent required to establish calculated retaliation for purposes of the terrorism enhancement. We instead look to whether the offense itself is 'calculated . . . to retaliate against government conduct.'"

*Id.* at 704 (citing 18 U.S.C. § 2332b(g)(5)(A)); *see also Ramirez*, 16 F.4th at 854 ("[t]o assume an offense listed in §2332b(g)(5)(B) is *per se* a 'federal crime of terrorism' without a separate

finding as to 'calculated' would render the 'calculated' requirement in §2332b(g)(5)(A) superfluous") (citing *United States v. Fidse*, 862 F.3d 516, 524 (5th Cir. 2017); *Chandia*, 514 F.3d at 376).

The Appellate Court ultimately held that the district court's reasoning focusing on ISIS's conduct of retaliation, which was a theme in the chatroom the defendant visited, was not enough to satisfy this prong: "[g]enerally assisting a terrorist organization…does not necessarily demonstrate an intention that the [assistance is] to be used to retaliate against a government, and there is no evidence that [defendant] sought revenge on any particular government or for any specific government conduct." *Id.*

Like in *Jumaev*, Mr. Chhipa may have been convicted of knowingly supporting a foreign terrorist organization, but there was no showing that his conduct supported a specific intent to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct; and certainly, the jury made no such specific intent finding. It is the government's burden to provide the specific intent element by clear and convincing evidence, and the government cannot meet that burden here. *See Alhaggagi*, 978 F.3d at 700. *See also United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009) ("[p]reponderance of the evidence is the appropriate standard of proof for sentencing purposes"); *United States v. Noe*, 191 Fed. Appx. 216 (4th Cir. 2006) (district court's use of preponderance of evidence standard in making factual findings supporting sentencing enhancements was constitutional). Like in *Alhaggagi*, Mr. Chippa's crime was non-violent, and the terrorism enhancement is meant only "to punish certain dangerous terrorists more severely than persons who committed non-violent crimes." *Id.* Here, the sum total of Mr. Chhipa's actions in committing the instant offense were the posting of

blusterous comments on social media and donating funds for humanitarian work—oftentimes at the explicit direction of the FBI.

As such, for the reasons detailed above, Mr. Chhipa's criminal history should be recalculated to reflect his lack of criminal history—thus making him a Category I and removing the twelve-level enhancement to Count Group 1.

### b.  Material Support Enhancement—§2M5.3(b)(1)(E)

Mr. Chhipa objects to the two level-specific offense characteristic enhancement at U.S.S.G §2M5.3(b)(1)(E).  The Guidelines provide for a two-level enhancement under §2M5.3 when "the offense involved the provision of … funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." USSG §2M5.3(b)(1).

Because the enhancement applies only to cases where the defendant has an intent or reason to believe his support would be used to commit a violent act, §2M5.3(b)(1) serves as "an internal enhancement mechanism to calibrate the severity of the sentence to the culpability of the conduct and the harm." James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4*, 28 Law & Ineq. 51, 73 (2010).  Courts have applied it in cases where the defendant's conduct unequivocally supported or was intended to support specific acts of violence.  For example, in *United States v. Aref*, No. 04-CR-402, 2007 U.S. Dist. LEXIS 17926, at *5 (N.D.N.Y. Mar. 14, 2007, the court applied §2M5.3(b)(1)(E) when the facts at trial showed that the defendant laundered funds from a confidential witnesses' purported importation of surface-to-air missile with the knowledge that it would be used in an attack on the Pakistani Ambassador in New York City "in order to teach the President of Pakistan a lesson."

Here, there is no direct connection between Mr. Chhipa and any violent acts. Further, for much the same reasons identified above, applying this enhancement simply because he provided material support to an organization that commits violent acts would necessitate that it would apply to every material support case—as every material support case involves providing support to a violent terrorist organization that commits violent acts because that's the definition of a foreign terrorist organization. *See also United States v. Nayyar,* 2013 U.S. Dist. LEXIS 79002, at *20 (S.D.N.Y. June 4, 2013) ("[s]ince any organization that is deemed to be a terrorist organization under the statute is, by definition, considered to engage in violent acts, *see* 8 U.S.C. § 1182, the Weapons Enhancement applies to virtually every conviction for providing material support to a terrorist organization, without distinguishing between the ultimate harm caused by the offense conduct.").

Without conceding that *United States v. Dhirane*, 896 F.3d 295, 304 (4th Cir. 2018) was correctly decided,[4] even the Fourth Circuit's holding in *Dhirane* does not require application of 2M5.3(b)(1)(E) here. *Dhirane* still requires "that the defendants be shown to have intended, known, or had reason to believe that their support *would* be used to assist in acts of violence by

---

[4] The holding on this point in *Dhirane* is not based on any cited authority and conflicts with the plain reading of the enhancement. *See Dhirane*, 896 F.3d at 304-05. A plain reading of the enhancement indicates that the material support must be provided with the intent or knowledge that it is to be used in the commission of a particular, identified violent act. The enhancement does not say "some" act or "any" act, nor does it even provide for act*s* (plural). It plainly says "*a* violent act." (emphasis added).

The correct manner of implementing §2M5.3(b)(1)(E) becomes even more apparent when 18 U.S.C. §2339C(a)(1)(B) is examined which is the statute to which the guideline commentary connects §2M5.3. The statute reads: "Whoever...unlawfully and willfully collects funds with the intention that such funds are to be used...in order to carry out – (B) any other act intended to cause death or serious bodily injury to a civilian...when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act." Thus, §2M5.3 cannot be applied to §2339C(B) without also requiring that the "act intended to cause death or serious injury" being specially identified.

the terrorist organization." *Id.* (emphasis added).  The evidence at trial did not establish that any support Mr. Chhipa may have provided *would* be used to assist in acts of violence by the Islamic State.

Finally, the application of §2M5.3(b)(1)(E) requires the Court to double-count the same factors that have already been accounted for in the other Guidelines provisions.  In a case that held §2M5.3(b) did not impermissibly double count, it did so based on an analysis that the two enhancements (§2M5.3(b) and §3A1.4(a)) constituted distinct characteristics.  *See United States v. Banol-Ramos*, 516 Fed. Appx. 43 (2d Cir. 2013) (finding that the application of USSG §§ 2M5.3(b) and 3A1.4 did not constitute impermissible double-counting because conviction for material support of terrorist organization did not necessarily imply that the defendant committed the offense of terrorism or that she provided firearms to that organization, and each enhancement represented discrete harm (one encompassed her commission of crime of terrorism and other encompassed her provision of firearms and explosives)).  That is not the case here; the same conduct underlies both the U.S.S.G. §§ 2M5.3(b) and 3A1.4 enhancements.

## II.    A Sufficient Sentence Under 18 U.S.C. §3553(a)

Indeed, by enacting 18 U.S.C. § 3553, Congress has *directed* that federal courts "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing based on the statutory factors laid out in the statute.[5]  The Supreme Court has held that sentencing courts are required to "consider what sentence is appropriate for *the individual*

---

[5] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

*defendant* in light of the [§ 3553(a)] sentencing factors," *Nelson v. United States*, 555 U.S. 350, 351 (2009) (emphasis added), to ensure that the punishment imposed in a particular case "fit[s] the offender and not merely the crime[,]" *Williams v. New York*, 337 U.S. 241, 247 (1949).  In determining the particular sentence for a given defendant, the Supreme Court has also stated that the Sentencing Guidelines cannot be used as a substitute for a court's independent determination of a just sentence.  *See Spears v. United States*, 555 U.S. 261 (2009).

The facts of this case are known all too well to this Court and need not be fully restated here.  Moreover, the government will surely rehash them again, as it has done in every pleading. What is important, however, is Mr. Chhipa's background; an individual who is now a first-time convicted felon with absolutely no criminal history.  Mr. Chhipa, now 35, was born in Gujarat, India, as the youngest of four siblings to his married parents; his father—a retired hospital and nursing home food supplier, now 65 years old—and mother—a retired home daycare provider, now 63 years old.  Though Mr. Chhipa was born abroad, he has spent almost all his life in the United States—at least from age 4—and is now a citizen.

Growing up in his adopted country was not easy and proved to be financially difficult; his family, which sustained itself on a very modest income, only secured their first home in Fairfax, Virginia, through the Section 8 housing program.  These difficulties were only compounded by the intra-family dynamics at play during Mr. Chhipa's formative years (and into early adulthood):

> [Mr. Chhipa] advised [that] he was frequently subject to taunting and bullying by several relatives who stated he would never get married due to his appearance, as he has a darker skin tone than most of his family members. He noted it significantly affected his self-confidence. When he turned 18, he began seeking a Muslim woman to marry.

PSR, ¶91.

Indeed, as discussed at great length during the trial, Mr. Chhipa's isolation, loneliness, and desire to start a family of his own were a significant factor in the instant case. At trial, SA Davis testified that he used the fake persona of a woman and the friend of the FBI's fake bride, Tasneem Mac, to interact with Mr. Chhipa online. SA Davis was also forced to admit that Mr. Chhipa considered himself to be a pathetic coward with low self-esteem who had been trying to get married for ten years with no success. SA Davis also testified that the FBI used a marriage ruse to introduce various covert FBI employees to Mr. Chhipa—under the guise of facilitating a fictitious marriage to Tasneem Mac.

Separately, another covert agent, SA Jones, testified that he, under the guise of being the broker for Mr. Chhipa's fake bride, met with Mr. Chhipa twice and chatted with him online. SA Jones testified that Mr. Chhipa had been previously approached to be a confidential source for the FBI but that he (Mr. Chhipa) declined the FBI's offer. SA Jones testified that during his interactions with Mr. Chhipa, and regarding his fundraising efforts, he told Mr. Chhipa that Mr. Chhipa was sending money to "good people" and that there was "nothing wrong" with his fundraising efforts. SA Jones also testified that he told Mr. Chhipa multiple times he would get married and make a great husband—despite knowing full well that the marriage prospect was a total ruse.

Moreover, Mr. Chhipa has tried to fill his time while incarcerated by being productive. When he was not reviewing material for his case, he spent time taking classes to better his prospects upon his release—though the programming options have been limited given his classification at the ADC. *See* Exhibit 1, Certificates of Completion.

All this to say, the origins of this case can be attributed not to an evil and malignant heart that was hellishly bent on destruction but instead to the very human desire for community and

12

family and the lack of personal growth in these very fundamental and essential areas of the

human psyche.  Indeed, if this matter could be summed up in a single sentiment, it would have to

be despondency.  Mr. Chhpia took actions from a desire to enjoy community and belong—albeit

in the wrong form.  However, these misguided motivations are not reasons to throw Mr.

Chhipa's life away and incarcerate him for decades on end.

### c.   *The Guidelines artificially overstate Mr. Chhipa's criminal history and inappropriately increase his score.*

Even assuming *arguendo* that the terrorism guideline enhancement at U.S.S.G. §3A1.4(b)

applies, this Court should nevertheless vary downwards, significantly, in the imposition of Mr.

Chhipa's sentence.  "[The terrorism] guideline was enacted pursuant to a congressional directive

and absent empirical evidence.  Such guidelines do not exemplify the Sentencing Commission's

exercise of its characteristic institutional role and are generally entitled to less respect." *United

States v. Dais*, 482 F. Supp. 3d 800, 803 (E.D. Wis. 2020) (citing *Kimbrough v. United States*,

552 U.S. 85, 109 (2007); *United States v. Reyes-Hernandez*, 624 F.3d 405, 418 (7th Cir. 2010);

*United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1014 (N.D. Cal. 2019)).  In fact, another judge

within this Court has noted this lack of empirical basis as well, stating: "[t]he guidelines are not

based on any empirical research.  There has been no study to determine how much time a

terrorist should have…" Hon. Gerald Bruce Lee, Symposium, *Convicted Terrorists: Sentencing

Considerations and Their Policy Implications*, 8 J. Nat'l Security L. & Pol'y 347, 361 (2016).

As such, this Court should give little, if any, weight to the advisory Guidelines range.  *See also

United States v. Dais*, 482 F. Supp. 3d 800, 802-03 (E.D. Wis. 2020) ("[U.S.S.G. § 3A4.1] is

contrary to the purposes of sentencing in 18 U.S.C. § 3553(a), including the notion that sentences

should be individualized and proportionate, and that we should distinguish between the worst

offenders and those who are less dangerous.") (citing *United States v. Dorvee*, 616 F.3d 174, 186-87 (2d Cir. 2010)).

Indeed, not only is the terrorism guideline itself unsupported by empirical data, the terrorism guideline is "contrary to the theory behind the guidelines: that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category will reflect the risk to the public, based on the defendant's prior record.…Terrorism cases are undoubtedly serious, but automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense seems misguided." *United States v. Dais*, 482 F. Supp. 3d 800, 803 (E.D. Wis. 2020) (internal citations omitted).

As the court explained in *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1013 (N.D. Cal. 2019) (rev'd on other grounds), while the *offense level* reflects the seriousness of the charged conduct, "[a] defendant's *criminal history category* reflects something different." *Id.* (citing *Martinez*, 931 F.2d at 852 n.1 ("the distinction between the calculation of the offense level and the calculation of the criminal history category is important insofar as 'each calculation concerns a conceptually separate notion related to sentencing.'") (quoting *United States v. Goolsby*, 908 F.2d 861, 863 (11th Cir. 1990) (emphasis in original). A defendant's criminal history score "evaluates the need to increase [a given offender's] sentence incrementally to deter him [individually] from further criminal activity." *Id*. (citing *United States v. Scroggins*, 880 F.2d 1204, 1210 (11th Cir. 1989); *Nichols v. United States*, 511 U.S. 738, 751 (1994) (Souter, J., concurring) ("Prior convictions . . . serve under the Guidelines to place the defendant in one of six 'criminal history' categories; the greater the number of prior convictions, the higher the category. . . . the Guidelines seek to punish those who exhibit a pattern of 'criminal conduct.'"); U.S.S.G. Chapter Four, Criminal History and Criminal Livelihood, Part A — *Criminal History*

*Introductory Commentary* ("A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment…Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation."); *United States Sentencing Commission*, "A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score, Jan. 4, 2005 at 1-3 (goals for criminal history instrument are "to predict recidivism" and "reflect offender culpability" in the form of "harsher punishments for offenders with aggravated prior criminal backgrounds")). [6]

Based on this stated purpose, the *Alhaggagi* court opined, "[i]f terrorism sentences are too low, the Sentencing Commission can recommend increasing the offense level for those crimes. But automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense is inappropriate, as it does not reflect—unlike every other offense—the seriousness of the defendant's previous criminal convictions." 372 F. Supp. at 1014.

Indeed, as the *Alhaggagi* court further opined, "[t]he terrorism enhancement treats all terrorism defendants as if they are career criminals." *Id.* at 1016 (citing U.S.S.G. § 3A1.4(b); James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 57 (2010) ("The shift to Criminal History Category VI ensures that a defendant will be sentenced as if he or she were a career criminal, with no empirical evidence that this is true or fair…")). However, "Career criminals—individuals who have repeatedly demonstrated their refusal or inability to follow the law—have a higher likelihood of recidivism." *Alhaggagi*, 372 F.Supp. at 1016 (citing *United States v. Segura-Del Real*, 83 F.3d 275, 277 (9th Cir. 1996) ("But

---

[6] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2005/20050104_Recidivism_Salient_Factor_Computation.pdf

category VI is different from the other categories.  Defendants are placed in category VI because they are the most intractable of all defendants."); *id.*, at 279 n.1 ("defendants in Category VI, the highest criminal history category, are, not surprisingly, the defendants who demonstrate the most limited likelihood of successful rehabilitation and the greatest likelihood of recidivism"); *United States v. Bad Marriage*, 392 F.3d 1103, 1117 (9th Cir. 2004) (Callahan, J., dissenting) ("all category VI defendants have lengthy criminal records. 'It is the very circumstances of their recidivism which puts them in this category.'") (quoting *Segura-Del Real*, 83 F.3d at 277)).

Just as the defendant in *Alhaggagi* was not a career criminal, neither is Mr. Chhipa.  In fact, he is in a criminal history category I; "[a]bsent the enhancement, he would have a criminal history category of I.  *Id.* (citations omitted).  Automatically assigning him a criminal history of VI would be illogical and unjust."  However, as *Alhaggagi* states, "[f]ortunately, the guidelines provide that '[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.'" *Id.* (citing U.S.S.G. § 4A1.3(b)(1)).  "The presumption under U.S.S.G. section 3A1.4 is incompatible with 18 U.S.C. § 3553, which requires that a defendant be evaluated individually to justify his or her sentence." McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4*, 28 Law & Ineq. at 116.

And a significant downward departure is warranted here.  As demonstrated above, the idea that Mr. Chhipa's criminal history score should be increased based on an assumption about recidivism is entirely unsubstantiated and misguided: "As James McLoughlin, Jr. noted in his article, 'when U.S.S.G. section 3A1.4 was adopted, the number of [] anti-terrorism cases was tiny, so there could be no analysis of a statistically reliable group of defendants upon which to

build a reliable Guideline.'" *Id.* (citing *McLoughlin* at 112; *id*. at 115 ("[t]here is no published statistical data demonstrating that defendants convicted of violating 18 U.S.C. §§ 2339B, 2339C, or other anti-terrorism statutes . . . are any more likely to be recidivists than any other first offenders. Nothing in the history of U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist."); Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1550 (2017) ("no statistically sound evidence was used")).

In fact, now the Court does have more data, which undermines the draconian application of §3A1.4(b),  and "[o]f the more than 300 prisoners who have completed their terrorism sentences since 2001," there were only "a handful of cases in which released inmates had been rearrested, a rate of relapse far below that or most federal inmates." *Id.* (citations omitted).  The Intercept's, "Trial and Terror" series and data project in 2017 revealed that more than half of all people convicted of a terrorism offense since 2001 had been released.  *See* Trevor Aaronson and Margot Williams, *Trial and Terror*, The Intercept (May 31, 2019) (noting that 479 terrorism defendants out of 891 have been released from custody).[7] Though the study concedes there is relatively little data on recidivism after a terrorism conviction, it notes that "[n]one of the convicted Islamist terrorists released from federal prison have been charged with new terrorism-related offenses or have been alleged to be part of a terrorist plot in the United States." Trevor Aaronson, *Is "Terrorist Recidivism" Real?* The Intercepts (May 27, 2019).[8]  A more recent study "by Dr. Omi Hodwitz—Assistant Professor in the Department of Sociology and

---

[7] Available at https://trial-and-terror.theintercept.com/

[8] Available at https://theintercept.com/2019/05/27/terrorist-recidivism-john-walker-lindh/

Anthropology at the University of Idaho and a Research Affiliate of the National Consortium for

the Study of Terrorism and Responses to Terrorism at the University of Maryland—collected

data for terrorist offenders and analyzed their post release criminal histories. Only 1.6% of

terrorist offenders released between 2001 and 2018 recidivated, and none of the crimes which

they committed post release were clearly politically motivated." *United States v. Ceasar*, 388 F.

Supp. 3d 194, 214 (E.D.N.Y. 2019) (internal citations omitted).

    As previously stated, Mr. Chhipa, a first-time felon with no criminal history. It is

submitted that any term of incarceration—for an individual who has never before served a

sentence—is a significant punishment. This common sense and universally known principle of

sentencing was succinctly stated by the Second Circuit:

> Obviously, a major reason for imposing an especially long sentence upon those who
> have committed prior offenses is to achieve a deterrent effect that the prior
> punishments failed to achieve. *That reason requires an appropriate relationship
> between the sentence for the current offense and the sentences*, particularly the
> times served, for the prior offenses. If, for example, a defendant twice served five
> or six years and thereafter committed another serious offense, a current sentence
> might not have an adequate deterrent effect unless it was substantial, perhaps fifteen
> or twenty years. *Conversely, if a defendant served no time or only a few months for
> the prior offenses, a sentence of even three or five years for the current offense
> might be expected to have the requisite deterrent effect.*

*United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001) (emphasis added).

    Indeed, both specific and general deterrence in the criminal justice context is primarily

achieved through the act of being caught, not through lengthy prison sentences—especially for

first time offenders. Research has proven this axiom time and time again. *See United States v.

Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014) ("An avalanche of criminological

studies have determined that this theoretical symmetry between severity of punishment and

certainty of detection does not exist in the real world.") (citing Isaac Ehrlich, *Participation in

Illegitimate Activities: A Theoretical and Empirical Investigation*, 81 J. Pol. Econ. 521, 544-47

(1973) (finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, *The Deterrent Effect of Perceived Severity of Punishment* 59 Soc. Forces 471, 472 (1980) (reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process") Jeffrey Grogger, *Certainty v. Severity of Punishment* 29 Econ. Inquiry 297, 304 (1991) (studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity")).

Even the Sentencing Commission itself acknowledged this fact: "[t]here is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004). Perhaps most notably, the Department of Justice has tacitly acknowledged this fact, "[c]onfinement or increased length of incarceration served the crime control purpose of incapacitation but had little or no effect as a 'treatment' with rehabilitative or specific deterrent effects" Don M. Gottfredson, U.S. Department of Justice, National Institute of Justice, *Effects of Judges' Sentencing Decisions on Criminal Cases*, Research in Brief 9 (Nov. 1999).

As such, given that Mr. Chhipa has never before spent any time incarcerated, a sentence of no more than 96 months, with a lengthy period of supervised release, would provide a significant deterrence to Mr. Chhipa in the future.

### d. *The Need to Avoid Unnecessary Sentencing Disparities Support a Variant Sentence.*

As part of the Court's calculus in arriving at an appropriate sentence, avoiding unwarranted sentence disparities among similarly situated defendants is an important and statutorily mandated factor that any sentencing court must consider in arriving at its ultimate sentencing decision. *See* 18 U.S.C. § 3553(a)(6). Considering the sentences received by other "material support" defendants, who engaged in equally (if not more) destructive conduct than that present in the instant case, it becomes clear that 8 years (96 months) is more than sufficient and arguably already greater than necessary, to achieve the goals of sentencing in Mr. Chhipa's case.

In *United States v. Dais*, 482 F. Supp. 3d 800, 801 (E.D. Wis. 2020), the defendant engaged in an array of online activity, which included providing advice on how to make explosive devices and poison, prepare for an attack, and select targets. She hacked into social media platforms to promote ISIS ideology, recruit adherents to ISIS, collect information on how to make explosives and biological weapons and on how to conduct terrorist attacks, and distribute that information to individuals interested in conducting attacks on behalf of ISIS. During undercover communications, the defendant suggested potential targets for attacks, discussing the number of people who should be killed and starting with poisons first (and discussing how to create them). She also discussed the Boston Marathon bombing, stating, "[i]t was very easy to make. All it needs is a pressure cooker, shrapnel and explosives. Join my channel and research." When she was arrested, the defendant stated that she had engaged in this conduct out of boredom. The defendant pled guilty to one count of attempting to provide material support. The government requested a 20-year sentence, and the Court ultimately sentenced her to 90 months.

In *United States v. Doe,* 323 F. Supp. 3d 368 (E.D.N.Y. 2018), the defendant pled guilty to material support for a foreign terrorist organization after traveling to Syria and receiving training from ISIS.  There the defendant remained for several months until he managed to escape back to Turkey and into the arms of United States authorities.  *See id.*  Despite his Guidelines range of approximately 30 years, the district court sentenced Doe to time-served, which was approximately two years, stating, "Further incarceration will inhibit defendant's reentry into lawful life and could encourage defendant to re-engage with violent extremism.  Rehabilitation will more likely be achieved through a long term of supervised release…." *Id.* at 392.

Moreover, the mere fact that Mr. Chhipa chose to exercise his Constitutional right to trial should not dissuade this Court from imposing a 96-month sentence.  In July 2018, in Colorado, Bakhtiyor Jumaev was convicted of three counts involving material support to a terrorist organization after a 19-day jury trial.  Bakhtiyor Jumaev mailed his co-defendant, Jamshid Muhtorov $300 after Mr. Muhtorov informed him that the Islamic Jihad Union (IJU) needed financial support.  *United States v. Jumaev*, No. 12-cr-00033-JLK, 2018 WL 3490886 (D. Colo. July 18, 2018).  There, "[t]he trial was extensive, lasting seven weeks and involving hundreds of exhibits and tens of witnesses.  The resources expended—to bring foreign witnesses and experts here, to depose witnesses abroad, to ensure accurate translations, to sift through mountains of evidence, and to exhaustively litigate the relevant issues—were great." *Id.*  Nevertheless, the court recognized that "Mr. Jumaev was entitled to a fair trial and put forward the type of legitimate defenses that necessitate a trial." *Id.*  At sentencing, the court found the guidelines to be "illogical and inadequate."  The court called the Terrorism Enhancement a "wrecking ball" and "draconian," and the government's request for a 15- year sentence "absurd." *Id.*  The district court sentenced Jumaev to time served, which equated to 76 months.

21

These cases stand in stark contrast to the twenty-year sentence imposed by this Court upon Mr. Chhipa's wife—Allison Fluke-Ekren.[9]  Fluke-Ekren, a woman originally from Kansas, pled guilty to being a leader of a female battalion in Syria.  Fluke-Ekren "aided terrorist groups for more than six years while in Iraq, Libya and Syria…."[10] She provided military training to over 100 women and young girls in Syria for ISIS, some of which involved using AK-47 rifles, grenades and explosive suicide belts.  Fluke-Ekren also "assisted leaders of Ansar al-Sharia, the terrorist group behind the 2012 attack that killed four Americans in Libya…." *Id.* In her plea, she admitted that "she had ideas for a mass-casualty strike in the United States that were never put into action." *Id.* A government witness "told investigators that Fluke-Ekren had the idea in 2014 to bomb a U.S. college in the Midwest." *Id.*  Another government witness "who was with Fluke-Ekren in Iraq and Syria told U.S. investigators how the former Kansas mom 'explained that she could go to a shopping mall in the United States, park a vehicle full of explosives in the basement or parking garage level of the structure, and detonate the explosives in the vehicle with a cell phone triggering device.'" *Id.*  Indeed, an expert interviewed by the Washington Post, "called Fluke-Ekren's turn to extremism the 'worst-case scenario we've been talking about since 2011.'" She said, "It is a woman from a Western country, the United States, becoming part of this.  She wasn't brainwashed, she wasn't trafficked…She is someone who absolutely decided to go, and once there, absolutely leaned in." *Id.*

Unlike Fluke-Ekren, Mr. Chhipa did not engage in any actual acts of violence.  As repeatedly stated throughout the pendency of this entire matter, Mr. Chhipa demonstrated his

---

[9] *See United States v. Fluke-Ekren*, 1:22-cr-00092-LMB (E.D.VA 2022)

[10] Salvador Rizzo, *Kansas woman who joined ISIS pleads guilty to terrorism charge* Washington Post (available at https://www.washingtonpost.com/national-security/2022/06/07/kansas-mom-pleads-guilty-to-terrorism/)

propensity to engage in odious bravado, but his actions were, for the most part, limited to faceless social media and online posting/ commentary. Indeed, the only substantive real-world behavior demonstrated at trial were interactions that were planned, orchestrated, and supervised by the FBI agents—the FBI's donation of government proceeds to Mr. Chhipa and the FBI's attempt to set him up with a fake bride. Indeed, as demonstrative of Mr. Chhipa's actual nature, on several occasions, Mr. Chhipa brought the FBI agents thoughtful gifts—such as religiously acceptable deserts and sweets—and brought along his mother, hardly the behavior of a hardened terrorist operative.

### III.    Objections to Conditions of Supervised Release

Mr. Chhipa objects to Special Conditions of Supervision #5, #6, and #7 as overly vague. PSR, pp. 23-24. Combined, all three conditions place significant restrictions on Mr. Chhipa's First Amendment right to communicate and interact with others and on information and materials that he could possess or view, all based on their supposed connection to "extremist organizations." This is plainly too vague.

"The terms and conditions of supervised release are a substantial imposition on a person's liberty." *United States v. Maxwell*, 285 F.3d 336, 342 (4th Cir. 2002). As such, any condition imposed must be precise and clear. *United States v. Van Donk*, 961 F.3d 314, 323–24 (4th Cir. 2020) ("[a] condition of supervised release is unconstitutionally vague if it doesn't give a probationer "fair notice of the conduct that it punishes" or is "so standardless that it invites arbitrary enforcement."); *see also United States v. Hall*, 912 F.3d 1224, 1226 (9th Cir. 2019) (*per curiam*) (a condition prohibiting a father from contacting his son except "for normal familial relations" was vacated as unduly vague); *United States v. The-Nimrod Sterling*, 959 F.3d 855, 863-64 (8th Cir. 2020) ("The condition orders Sterling to provide any requested financial

information, a hopelessly vague and overbroad term when no context is provided[]") (internal

quotations omitted). Moreover, in order to comply with the requirements of 18 U.S.C. §3583(d),

in this Circuit, conditions of supervision must:

> (1) be "reasonably related" to the nature and circumstances of the offense, the history and characteristics of the defendant, and the statutory goals of deterrence, protection of the public, and rehabilitation; (2) involve "no greater deprivation of liberty than is reasonably necessary" to achieve those purposes; and (3) accord with any pertinent Sentencing Commission policy statements.

*United States v. Castellano*, 60 F.4th 217, 225 (4th Cir. 2023).

When a condition is vague, such as the "extremist" prohibitions here, it infringes on an

individual's First Amendment rights. *See United States v. Brown*, 223 F. App'x 722, 723 (9th

Cir. 2007) (holding that the district court's use of the phrase "may connote" in connection with

its prohibition on the defendant from wearing clothing or displaying articles that "may connote

affiliation with, or membership in" certain street gangs failed to adequately define or provide

notice of what apparel defendant should refrain from wearing and therefore it was plain error for

the district court to impose such a vague condition implicating First Amendment freedoms[]");

*United States v. Loy*, 237 F.3d 251, 267 (3d Cir. 2001) (explaining that the condition of

supervision is vague and "with no guidepost for [the defendant], the pornography prohibition as

currently written violates due process by failing to provide [the defendant] with adequate notice

of what he may and may not do, chilling his First Amendment rights in the process[]"); *United

States v. Holena*, 906 F.3d 288, 294 (3d Cir. 2018) (explaining that a district court must consider

a defendant's First Amendment rights when fashioning conditions of release).

Here, each of the requested special conditions regarding "extremism" do not put Mr.

Chhipa on "fair notice of the [punished conduct]" and are "so standardless that [they] invite[]

arbitrary enforcement.'" *Van Donk*, 961 F.3d at 323-24. The term "extremism" or "extremist"

can hold a variety of meanings depending on one's perspective, and the conditions provide no indication as to what constitutes "extremist" or "terroristic" and certainly no notice as to what will be "deemed to be inappropriate by the U.S. Probation Office. Such a board condition delegates too much unfettered discretion to the probation officer. *See States v. Miller*, 341 Fed. App'x 931, 932-33 (4th Cir. 2009) ("[d]etermination of whether a court has improperly delegated the judicial authority of sentencing is based on distinguishing between the delegation to a probation officer of 'a ministerial act or support service' and the 'ultimate responsibility' of imposing sentence ... it is permissible to delegate to the probation officer [only] the details of where and when [a] condition will be satisfied.") (internal citations and quotations omitted).

## IV.    Judicial Recommendation

In addition to determining Mr. Chhipa's sentence, the Court also has the ability to make a recommendation to the BOP regarding his placement within the federal penal system. *See, e.g.,* 18 U.S.C. § 3621(b)(4)(B) (BOP can designate any facility determined to be "appropriate and suitable, considering," *inter alia*, "any statement by the court that imposed the sentence . . . recommending a type of penal or correctional facility as appropriate"). Though any recommendation that this Court chooses to make is not binding, the BOP is statutorily required to consider such a recommendation when making its ultimate decision regarding Mr. Chhipa's placement. *Id*., § 3621(b)(4)(B) & (b)(5).

The BOP's stated goal is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society," U.S. Dep't of Just., BOP Program Statement P5100.08 (2016),[11] in conjunction

---

[11] Available at: https://www.bop.gov/policy/progstat/5100_008.pdf

with the relevant § 3553(a) factors. As applied here, it becomes clear that FCI - Butner (Low) - North Carolina is the most appropriate institution for Mr. Chhipa to serve his sentence. As it relates to FCI-Butner, this facility is close to Mr. Chhipa's family, and a placement there would not jeopardize his family support network while he was serving his sentence. If, for some reason, the BOP is unable to place Mr. Chhipa at Butner, he would also ask that the Court recommend the following facilities in this order: FCP-Alderson (Camp)-West Virginia, or, FCI-Tallahassee (Low)-Florida.

## **CONCLUSION**

As such, for the aforementioned reasons, Mr. Chhipa respectfully requests that the PSR be amended in conformity with the corrections and objections detailed above. Mr. Chhipa also requests that this Court impose a sentence of *no greater than* 96 months of imprisonment (followed by a reasonable period of Supervised Release).

Respectfully Submitted,
MOHAMMED AZHARUDDIN CHHIPA,
By Counsel
       /s/
Zachary A. Deubler, Esq. VSB #90669
Jessica N. Carmichael, Esq. VSB #78339
CARMICHAEL ELLIS & BROCK, PLLC
108 N. Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 684-7908
zach@carmichaellegal.com
jessica@carmichaellegal.com

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that, on the 16th day of April 2025, a true and accurate of the foregoing was served on all counsel of record via the Court's Electronic Filing System.  I further certify that a copy was also sent by e-mail to Kelly M. Smihal, Probation Officer, at Kelly_Smihal@vaep.uscourts.gov.

                                     _____/s/_____
                                    Zachary A. Deubler, Esq.